HAROLD G. HOFFMAN, PLAINTIFF, v. TRENTON TIMES (DESIGNATED IN COMPLAINT AS TRENTON TIMES, INC.), A CORPORATION OF NEW JERSEY, AND JAMES KERNEY, JR., DEFENDANTS.

Decided October 30, 1939.

For the plaintiff, *Harry Green* and *George L. Burton*.

For the defendant Trenton Times, *Pitney, Hardin & Skinner (Charles R. Hardin)*.

For the defendant James Kerney, Jr., *Douglas M. Hicks*.

KINKEAD, S. C. C. This is a rule to show cause why a judgment of $30,000 recovered by the plaintiff against the defendant Trenton Times, Inc., and a judgment of $20,000 against the defendant James Kerney, Jr., in a libel suit should not be set aside on the ground that the verdict is excessive, and the result of mistake, passion or prejudice.

The defendant Trenton Times, Inc., is the publisher of the newspapers known as the *Trenton Times, Trenton Sunday Times-Advertiser* and the *Trenton State Gazette*. The defendant James Kerney, Jr., is the editor of the three newspapers.

The plaintiff instituted a suit for libel against the defendants based on the publication of three editorials and a headline which appeared in the newspapers.

The complaint contained four counts, the first of which was concerned with the publication in the *Trenton Times* of an editorial entitled "Other People's Money" on January 24th, 1938. On this count the jury awarded plaintiff $10,000 against both defendants.

The second count was based on a headline which appeared in the *Trenton Sunday Times-Advertiser* on January 23d, 1938, which read as follows "Hoffman's Last Minute Treasury Raid Distributed $1,765 to Office Attaches." The jury awarded $5,000 damages on this count against the defendant Trenton Times, Inc., solely, the court having directed a verdict in favor of the defendant Kerney.

The third count was for the publication of an editorial entitled "A Treasury Raid" in the *Trenton State Gazette* on January 24th, 1938. The court likewise directed a verdict in favor of the defendant Kerney on this count and the jury awarded damages solely against the corporation in the sum of $5,000.

The fourth count was based on an editorial entitled "When Is a Bonus Not a Bonus" which appeared in the *Trenton State Gazette* on January 26th, 1938, and on which count the jury awarded the plaintiff $10,000 damages against both defendants.

Plaintiff had sought to recover both compensatory and punitive damages. The jury had been instructed to return any verdict favoring. plaintiff, in a form which would specify whether both compensatory and punitive damages had been awarded and if so, the sum awarded for each type of damages. Despite ample proof tending to establish express malice on the part of the defendants the jury made no award of punitive damages, the amounts recovered being for compensatory damages exclusively.

"Implied malice, in an action for libel, consists in publishing without justifiable cause, that which is injurious to the character of another. It is a presumption drawn by the law from the simple fact of publication. Express malice consists in such a publication from ill-will, or some wrongful motive, implying a willingness or intent to injure, in addition to the intent to do the unlawful act. It requires affirmative proof beyond the act of publishing, indicating ill-feeling, or such want of feeling as to impute a bad motive. It does not become an issue, when the article is libelous on its face, unless punitive damages are sought." *Weir* v. *McEwan,* 94 *N. J. L.* 92.

The proof as to malice consisted in the introduction into

evidence of numerous collateral editorials and news items attacking the plaintiff, and cartoons of a ridiculing and defamatory nature, which appeared in the three newspapers at different times over a period of several years commencing in the fall of 1934 shortly before the plaintiff was elected governor of New Jersey. There was further proof that plaintiff, before starting suit, had written to defendants explaining the legality and propriety of his public acts which were being criticised and demanding a retraction. No retraction was ever made by defendants.

Thus it was reasonable to anticipate, that any verdict for plaintiff would include punitive damages. One of the contentions of the defense is that the verdict is excessive because the jury had been influenced by the proof of express malice, and had included a punitive award in its verdict of compensatory damages, instead of making separate awards of each type of damages, as the court had directed.

It is not mandatory, even where a plaintiff has conclusively proven express malice for a jury to award punitive damages. A jury could award a plaintiff such damages as would properly compensate the plaintiff, and then refuse to punish the defendant by assessing punitive damages. Such a verdict would have to be upheld. The failure to award punitive damages would not invalidate it. A jury is under a duty to compensate a plaintiff in a libel suit, where the facts justify that course, and the plaintiff would receive such compensatory damages as a matter of right. But punitive damages are not awarded as a matter of right, but rather as a matter of discretion, and where none are awarded a plaintiff has no recourse if his compensatory damages properly compensate him.

"Punitive damages in a slander suit are not awarded upon the theory of compensation to the suffered, but as a punishment to the offender and a warning to others." *Hulbert* v. *Arnold*, 83 *N. J. L.* 114; 83 *Atl. Rep.* 497.

"That damages such as are called punitive or vindictive or exemplary may be awarded in actions of libel is a doctrine established by a long line of decisions. Mr. Addison says that wherever injury has been done to the fair fame, reputation or character of the plaintiff, juries are generally invited

to give, and are justified, in giving, such a sum as marks their sense of the maliciousness or recklessness of the wrongdoer in offering the insult and injury, their belief in the groundlessness of the charge, and their desire to vindicate the character of the plaintiff. *Add. Torts* 993." *Hoboken Printing Co.* v. *Kahn,* 59 *N. J. L.* 218 (at *p.* 221) ; 35 *Atl. Rep.* 1053.

Where, as here, the jury is instructed to bring in separate awards of compensatory and punitive damages, the jury must, if it proposes by its verdict to punish the defendants, do so by awarding punitive damages. The jury may not include a punitive award in a verdict which assesses compensatory damages exclusively.

The sums awarded to the plaintiff in the instant case, must therefore be tested as to their excessiveness, by having due regard for the fact that they represent solely, the jury's intent to compensate the plaintiff.

The editorial "Other People's Money" charged that the plaintiff was guilty of being responsible for a dishonest treasury raid. The following excerpts are from that editorial :

"One of the most reprehensible and essentially dishonest treasury raids in the history of New Jersey was that put across in the last minutes of his administration by former Governor Hoffman.

"Instead of distributing largess to his office cronies by digging into his own pocket, Mr. Hoffman preferred to use $1,765 of other people's money * * *.

"It would seem that there should be an official inquiry into this inexcusable raid. Maybe Mr. Hoffman can be compelled, as he certainly should be, to make good the $1,765 item from the $12,000 salary that he soon will be receiving as head of the State Unemployment Compensation Commission.

"The height of personal cheapness is reached by the man who seeks popularity by utilizing funds that don't belong to him. But, in the case of Mr. Hoffman, that method of self-aggrandizement is precisely what New Jersey's taxpayers have long since learned to expect."

The editorial "A Treasury Raid" refers to the same incident and the following excerpts are taken therefrom :

"* * * In view of the sordid record of the last three years, it is not surprising to learn of the last-moment scat-

tering of public funds for the benefit of the Governor's collection of servitors in the executive office. * * *

"The affair has a rather unsavory tinge and in this respect it bears a close resemblance to a great deal more that has happened during these last three years."

The following excerpts are from "When Is a Bonus Not a Bonus?":

"Former Governor Harold G. Hoffman objects to criticism of his last-minute payments to favorites on his staff * * *. And he doesn't like to have his action termed a 'treasury raid.'

"* * * And in all probability the average citizen looks on the extra pay for Hoffman's followers as an uncalled for raid on the long-suffering treasury of New Jersey."

The plaintiff has been in public life for many years. In fact he has made public life his career. He is consequently dependent upon the good will of the people. The preservation of his reputation is vital, if that good will is to be retained; and therefore defamation which tends to destroy or injure his reputation would be far more damaging to him than to the average citizen. The jury had the right to find that these different libels lowered the political standing and prestige of the plaintiff, that they caused him profound mental anguish, and that his general repute was gravely impaired.

"A new trial may be had for excessive damages, but in that case the damages ought not to be weighed in a nice balance, but must be such as appear at first blush to be outrageous and indicate passion or partiality in the jury." 2 *Tidd. Prac.* 909.

Mr. Justice Nevins speaking for our Supreme Court as far back as the year 1850 in *Somerville and Easton Railroad Co.* ads. *Doughty,* 22 *N. J. L.* 495, held (at *p.* 497):

"This court has the power to set aside this verdict; but we will not exercise that power, unless we are clearly satisfied that it is wrong, exorbitant and oppressive, and so much so as to strike the mind of every reasonable man, at once, that the jury, from some cause, have done the defendants gross injustice. We cannot exercise this power rudely because we may think the verdict too high; * * *."

This principle of law has been repeated in numerous decisions since 1850, and in recent years Judge Kays in speaking

for the Court of Errors and Appeals in *Gee* v. *Moss et al.*, 108 *N. J. L.* 160 (at *p.* 161) ; 156 *Atl. Rep.* 458, held:

"The amount of the award is a matter primarily invested in the jury and the mere fact that the award is so high that the trial judge admitted that he, personally, felt it was too high does not compel the trial court to direct a rule to show cause why it should not be set aside. In other words, the mere fact that the verdict seems to the court to be excessive does not indicate that it is the result of mistake, passion or prejudice on the part of the jury, when there is sufficient evidence before the jury, which the jury might believe, to justify the verdict rendered."

In *Earl* v. *Times-Mirror Co.*, 196 *Pac. Rep.* 57, in which case a verdict of $25,000 compensatory damages in a libel suit was held not to be excessive, the court said (at *p.* 68) :

"In measuring the effect of a libel upon an individual, the jury is not confined to a consideration of the nature or purport of the words used, but is to consider also the effect upon the reputation of the plaintiff. It follows that, even though smaller judgments for more opprobrious words have been sometimes held to be excessive, it may, nevertheless, be true that the reputation of a man widely known, and who is seeking to maintain a reputation for public spiritedness and broadmindedness, may be greatly damaged by words of much less serious import. A man of less extensive reputation may, to some extent, overcome the effects of a libel by moving from one location in a city to another or from one community to another, while the man who is well known throughout the entire city or community cannot escape the effects of a libel, even if he had the desire to move from one place to another for that purpose."

In the case of *Evans* v. *Star Co.*, 209 *N. Y. Supp.* 267, the Supreme Court of New York county held that a verdict of $100,000 compensatory damages and $25,000 punitive damages was not excessive in a libel suit in which only one libelous article was charged against the defendant. In another New York case, *Tillotson* v. *Cheetham, 2 Johns.* 63 (at *p.* 74), Chief Justice Kent held) :

"We have no standard by which we can measure the just amount, and ascertain the excess. It is a matter resting in

the sound discretion of a jury. The plaintiff, when libeled, was a high and confidential officer of government, and by the libel he is held out to the world as an object of reproach. He is represented as being seduced into unworthy and dishonorable conduct, by motives equally mean and unworthy."

And again in *Coleman* v. *Southwick,* 9 *Johns.* 45 (at *p.* 51); 6 *Am. Dec.* 253, Chief Justice Kent writes:

"The question of damages was within the proper and peculiar province of the jury. It rested in their sound discretion, under all the circumstances of the case, and unless the damages are so outrageous as to strike every one with the enormity and injustice of them, and so as to induce the court to believe that the jury must have acted from prejudice, partiality, or corruption, we cannot, consistently with the precedents, interfere with the verdict. It is not enough to say that, in the opinion of the court, the damages are too high, and that we would have given much less. It is the judgment of the jury, and not the judgment of the court, which is to assess the damages in actions for personal torts and injuries."

In New Jersey in the case of *Hulbert* v. *Arnold, supra,* a verdict of $10,000 in an action for slander was approved, and our Supreme Court in *Zambory* v. *Csipo,* 3 *N. J. Mis. R.* 153; 127 *Atl. Rep.* 573, held that a verdict for $10,000 in an action for libel was not excessive. The plaintiff in the latter case was a Hungarian banker who was by no means an important state or national figure. Moreover the libel was printed on a circular and apparently its circulation was limited to a restricted circle.

The plaintiff in the case *sub judice* is an important state and national personage. The combined circulation of the three newspapers was over ninety thousand, and it is quite reasonable to assume that they have over two hundred and fifty thousand readers, so that a striking contrast is furnished to *Zambory* v. *Csipo, supra,* which contrast is most persuasive that the verdict in the instant case is not excessive.

Then too it must be borne in mind that the plaintiff's verdict against the corporation was not for one libel based on a single cause of action, but for four separate libels, and that the lesser verdict against the defendant Kerney was for two separate causes of action.

Unquestionably the sums awarded to the plaintiff were large. But although they could very properly have been smaller, they cannot be adjudged, in the light of the evidence, to be so manifestly excessive as to be the result of mistake, passion, or prejudice.

The rule to show cause is discharged.